Filed 1/29/14  In re J.F. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re J.F., a Person Coming Under the Juvenile Court Law. | B251159 (Los Angeles County Super. Ct. No. CK88219) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>P.G.,<br><br>    Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Anthony Trendacosta, Commissioner.  Affirmed.

Rich Pfeiffer, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, Navid Nakhjavani, Deputy County Counsel for Plaintiff and Respondent.

## INTRODUCTION

P.G. (mother) filed a Welfare and Institutions Code section 388[1] petition seeking to have J.F., her four-year-old, placed with her or to grant her further family reunification services with unmonitored visitation. The juvenile court denied the petition and terminated mother's parental rights to J.F. pursuant to section 366.26.[2] Mother appeals, and we affirm.

## BACKGROUND

In April 2010, J.F. came to the attention of the Department of Children and Family Services (Department) when it received a report that mother would sit in a car with the windows rolled up smoking marijuana while J.F. sat in the back seat. Shortly thereafter, mother tested positive for cannabinoids. In August 2010, mother signed a voluntary family maintenance case plan pursuant to which she agreed to participate in parenting education and individual counseling to address case issues and domestic violence, and to submit to random drug and alcohol testing. If mother missed a drug test or tested positive for drugs, she was to enroll in a drug treatment program.

In late September and early November 2010, mother was observed to have bruises on her legs and arms. The bruises appeared as though mother had been struck. Mother denied that the bruises resulted from domestic violence, and stated that she had fallen from a bicycle. Later, mother admitted that she and her boyfriend, Eli M., had engaged in some "rough play." Mother said that the bruises were "not a big problem."

---

[1]    All statutory citations are to the Welfare and Institutions Code unless otherwise noted.

[2]    In the introduction to mother's opening brief, mother states that she is appealing from the juvenile court's order denying her section 388 petition and its order terminating her parental rights pursuant to section 366.26. The argument section of mother's opening brief is devoted exclusively to mother's claim that the juvenile court erred in denying her section 388 petition. Mother's brief makes no specific argument that the juvenile court erred in terminating her parental rights pursuant to section 366.26.

In March 2011, the Department received a second referral concerning J.F. The report alleged that Eli M. struck mother's face, bruising her eye. Mother told the Department that Eli M. struck her during an argument at Universal Studios. The Department's concern about domestic violence was "mitigated" because mother and Eli M. terminated their relation and had no contact with each other. Mother stated that she and J.F. moved in with the maternal grandparents.

In May 2011, the Department received a third referral concerning J.F. The report alleged that mother was in her bedroom smoking marijuana with her friends with J.F. present. Maternal grandmother reported that mother became very upset with her and hit and pushed her while she held J.F. According to maternal grandmother, two weeks prior, mother hit and pushed maternal grandfather in J.F.'s presence.

A social worker interviewed mother in connection with the May 2011 referral. Mother denied using marijuana. She admitted that she punched maternal grandmother and maternal grandfather. Mother stated that during the incident, maternal grandfather slapped her face in J.F.'s presence. Although she no longer lived with Eli M., mother continued to have a relationship with him. Mother said that she, and not Eli M., was the abuser and aggressor in the relationship.

A team decision making meeting was held to address the Department's safety concerns. Because maternal grandmother did not want mother to live with her, mother had no place to stay. Mother agreed to allow J.F. to stay with maternal grandmother until she found a place she and J.F. could live.

In June 2011, the Department received a fourth referral concerning J.F. Maternal grandfather was alleged to have engaged in a physical altercation with Eli M. in J.F.'s presence after maternal grandfather found out mother was pregnant. Maternal grandmother reported that mother continued to be aggressive towards her and maternal grandfather. She said that even though mother stayed with J.F. all day, J.F. "jumped a lot" and was scared at night. Mother admitted Eli M. had hit maternal grandfather in J.F.'s presence, that she was pregnant, and that Eli M. was her unborn child's father. When mother became verbally aggressive toward the social worker, the interview ended.

In its Detention Report, the Department stated that J.F.'s father, Orlando F., was in prison for a 2009 physical attack on mother, which took place in J.F.'s presence. During the period between mother's positive drug test for cannabinoids in April 2010 and April 2011, mother was scheduled to take 22 drug tests. Mother "failed to test" for 16 of the tests and tested negative six times. Mother admitted to previous marijuana use but claimed to have stopped.

In June 2011, the Department filed a section 300 petition on behalf of J.F. The petition provided, as ultimately sustained, that mother and Eli M. had a history of engaging in violent altercations in J.F.'s presence, that Eli M. struck mother's face in March 2011, and that mother allowed Eli M. to frequent J.F.'s home and have unlimited access to J.F.; mother and J.F.'s maternal grandparents engaged in a physical altercation in J.F.'s presence in May 2011; mother and father had a history of engaging in violent altercations, and in December 2009, father struck mother's head with his fists, grabbed the inside of mother's mouth, grabbed and pull mother's hair, brandished and ran a knife down mother's leg, and threatened to kill mother and J.F.; mother had a history of substance abuse and was a current abuser of marijuana and alcohol which periodically rendered her incapable of caring for J.F.; and father, who was incarcerated, was unable to provide J.F. with the necessities of life including food, clothing, shelter, and medical care.

At the detention hearing, the juvenile court found there was a prima facie case for detaining J.F. and that he was a minor describe by section 300, subdivisions (a) and (b). The juvenile court ordered J.F. temporarily placed with the Department. Ultimately, J.F. was placed in the home of the paternal grandparents.

In an October 2011 Last Minute Information for the Court, the Department stated that mother's failure to submit to drug testing continued. Mother had, however, enrolled in individual counseling and had started outpatient drug treatment. Mother did not visit J.F. consistently. When mother visited J.F., she brought her boyfriend (presumably Eli M.) with her, despite a request that she not do so. J.F. "acted out" after visits with mother and the maternal grandparents.

4

In a December 2011 Last Minute Information for the Court, the Department reported that mother's failure to submit to drug testing continued. On two occasions when mother took a drug test, the results were negative. Mother visited J.F. on Thursdays and Sundays, and mother's interactions with J.F. were appropriate.

In January 2012, the juvenile court sustained the section 300 petition and declared J.F. a dependent of the juvenile court. The court ordered family reunification services for the parents. Mother was ordered to participate in individual counseling, parenting classes, drug counseling, and random drug testing.

In its July 2012 Status Review Report, the Department reported that J.F. remained placed in his paternal grandparents' home. A social worker stated that during a visit with J.F., the child was appropriately dressed in clean clothes, was well-groomed, and was free of marks or bruises that would indicate abuse or neglect. The paternal grandparents provided J.F. with a safe, nurturing home environment and were attentive to J.F. and to his needs. According to the report, J.F. had been re-placed four times during the reporting period, and had "major difficulty adjusting." J.F.'s behavior consisted of extreme tantrums, screaming, crying, biting, hitting, and pulling his caregiver's hair. J.F. had fewer tantrums after being placed with the paternal grandparents, but still screamed and cried excessively when he wanted something or did not get his way. A parenting instructor was provided to help paternal grandmother with J.F.'s behavior.

The report stated that J.F. had difficulty eating and sleeping. The paternal grandparents had worked very hard with J.F. to stabilize his sleeping routine and eating habits, and J.F. was sleeping and eating well. According to paternal grandmother, J.F. had more tantrums and difficulty eating and sleeping after visits with mother. At the end of visits, J.F. would scream and cry because he wanted to go with mother. After a period of adjustment, J.F. did not have any "problems" after visits with mother.

Near the end of September 2011, mother enrolled in the South Bay Family Recovery Center. In February 2012, mother was "discharged unsuccessfully" from the program after she tested positive for THC in one test and positive for THC and PCP combined in another test. In March 2012, mother enrolled in Little House Inc.

5

Residential Treatment Program. In June 2012, mother was "discharged unsuccessfully" from the program for making "false statements to the staff and deviation"—the deviation being mother's continued relationship with Eli M. Mother tested positive for marijuana in March and April 2012. According to the Department, mother had received numerous referrals and assistance, but had failed to complete any of the court-ordered programs.

J.F.'s counselor reported that J.F. had made progress in the previous five months due to his stability and home environment. According to the counselor, J.F. had "securely attached to his caregiver and is a generally happy toddler. Developmentally, he has also been exposed to a more stimulating environment as evidenced by his increase in vocabulary and emotional expression as well as gaining appropriate motor, problem-solving, and social skills for his age. I have observed [J.F.]'s strong emotional attachment to his paternal grandmother. He clearly seeks her out for affection and security and she reciprocates warmly." Paternal grandmother continued to meet J.F.'s needs with regular attendance at speech therapy, counseling, and other medical appointments as needed.

Paternal grandmother monitored mother's visits with J.F. The visits were moved from a church to the Department's office because mother acted inappropriately at the visits by, among other things, failing to follow the monitor's directions, taking J.F. to her car without the monitor, failing to leave on time, and bringing her abusive boyfriend (presumably Eli M.) with her. Mother behaved appropriately when a social worker served as a monitor with paternal grandmother.

The Department stated that mother had not complied with the disposition orders—she had not completed a drug and alcohol program and had been discharged from two drug and alcohol programs without a successful completion, she had not drug tested consistently, and she had not enrolled in individual domestic violence counseling. Mother's previous drug abuse and domestic violence issues continued to pose a substantial risk to J.F. Mother continued her relationship with her abusive partner, Eli M., stating that she maintained contact with him because he praised her for her accomplishments. Because J.F. was under the age of three at the time of detention,

6

mother was entitled only to six months of family reunification services. The Department recommended that the juvenile court terminate mother's family reunification services.

The Department's September 2012 Interim Review Report stated that mother had enrolled in an outpatient substance abuse program in July 2012. As part of the program, mother received life skills, cognitive behavioral therapy, relapse prevention, and individual substance abuse counseling. Mother missed two tests after enrolling in her new program. The Department recommended that mother enroll in an inpatient drug treatment program, due to her drug and alcohol history.

The Department reported that mother had not enrolled in individual counseling. Mother offered a variety of excuses for failing to enroll, essentially telling the social worker that she was too busy.

In its assessment, the Department wrote, "throughout the life of this case mother has not complied with individual therapy. Mother has a long history of being involved in domestic violence relationships and has a history of being physically aggressive. The issues have not been resolved as mother has not dealt with those issues in a therapeutic setting." Mother had tested positive for drugs, continued to minimize "the domestic violence," and continued to have physical contact with her abusive partner.

In October 2012, the juvenile court found the return of J.F. to the physical custody of his parents or parent would create a substantial risk of detriment to J.F.'s physical and emotional well-being. It further found that mother and father were in partial compliance with the case plan. The juvenile court terminated family reunification services for mother and father, and set the matter for a section 366.26 permanent plan hearing.

The Department's February 14, 2013, section 366.26 report stated that J.F. remained placed in the paternal grandparents' home, where he had lived since August 17, 2011. Since J.F.'s placement in their home, the paternal grandparents had maintained a healthy, nurturing, and safe environment for J.F. The paternal grandparents expressed their commitment to J.F. through the permanent plan of adoption. Mother was reported to have maintained a consistent visitation schedule. Mother visited J.F. for three hours on Saturdays, usually at a McDonald's or a park. Mother was appropriate during her visits

7

and interacted well with J.F. J.F. was always happy to see mother, whom he referred to as "Patty." Mother prepared a small meal for J.F. or bought him lunch at McDonald's. Due to the length and location of the visits, mother did not participate in J.F.'s daily activities. The visits were monitored. The Department recommended that mother's and father's parental rights be terminated, and that adoption be identified as the permanent plan for J.F.

The Department's February 2013 Last Minute Information for the Court stated that J.F. was very adoptable. J.F. appeared to be doing very well in his paternal grandparents' home. J.F. was very well taken care of by his paternal grandparents.

In June 2013, mother filed a section 388 petition, seeking to have changed the juvenile court's order terminating mother's family reunification services and scheduling a permanent plan hearing. Mother stated that she had enrolled in and "successfully participated" in a residential program at Shields for Families. She said that through individual counseling she had gained insight into and learned new skills to control her anger, disappointments, and substance abuse. She had taken parenting courses and learned how to be a better parent. Mother requested an order placing J.F. with her at Shields for Families or, alternatively, an order for further family reunification services and unmonitored visitation. The changed orders would be better for J.F., mother claimed, because he was closely attached to her and needed her in his life. A letter from Shields for Families stated that mother had enrolled in the Tamar Village Treatment Program at the end of October 2012. Mother participated in parenting classes, was doing well in her individual therapy, and had worked on her "core issues." Mother's participation was "very good," she had tested negative for all random drug tests, and she demonstrated a positive attitude towards peers and staff. The juvenile court granted mother a hearing on her section 388 petition and ordered the Department to prepare a supplemental report.

In August 2013, the Department filed an interim review report in which it responded to mother's section 388 petition. The social worker spoke with mother's substance abuse counselor at Shields for Families, Sally Tapia, who said that mother had "come a long way." Tapia said that mother was participating in a one to two year

8

program, was in the middle stages of her recovery, and was still working on her behaviors. According to Tapia, mother could benefit from additional treatment as she was in the "middle stages." Tapia reported that mother sometimes engaged in "child like behavior" by throwing tantrums, and believed that mother needed "to do some work" and "to identify her triggers" that led to such behavior. Mother reportedly had "not really been aggressive toward staff or others but still has outbursts she needs to work on." According to Tapia, mother claimed that she was no longer dating Eli M., but she still maintained contact with him.

The social worker also spoke to mother's therapist at Shields for Families, Murray Kaufman, who had weekly therapy sessions with mother and discussed with mother her domestic violence history. According to Kaufman, mother did not have complete knowledge and understanding of domestic violence and its impact on her and J.F.'s lives. However, mother was putting in effort, was "much better than before," and "was making progress."

The social worker also spoke with paternal grandmother who said that mother continued to have difficulty setting limits and boundaries for herself and J.F., continued to have outbursts, and continued to have contact with Eli M. Eli M. took mother to monitored visits and waited outside for her. Mother also maintained close contact with her brother, J.F.'s uncle, who had sexually abused mother. Such contact posed a high risk for J.F. as mother did not see any danger in having contact with someone who sexually abused her. According to paternal grandmother, mother wanted to set her own rules. Mother told paternal grandmother that the juvenile court granted mother permission to take J.F. to visit relatives or to have visits in inappropriate locations. Paternal grandmother was willing to have visits in different locations, but observed that J.F. was "not well when he is around various people and has many changes in his daily routine." Mother failed to appreciate how the presence of unfamiliar people and changes in J.F.'s daily routine affected J.F. and was "only looking out for her own benefit and not the child's emotional well being."

9

Apparently recounting an earlier conversation with paternal grandmother—on or sometime prior to April 18, 2013—the social worker reported that mother had violated visitation rules by taking J.F. to the bathroom and outside at McDonald's to play on a slide without paternal grandmother being present. When paternal grandmother informed the social worker of mother's visitation violations, the social worker called mother to explain the monitored visitation rules. Mother "lost control" and screamed at the social worker.

Paternal grandmother told the social worker that mother "loses control when there are limits and restrictions." In June 2013, mother called paternal grandmother and confronted and screamed at her because she would not allow a visit at a party at which mother stated that "all family members" would be present. Paternal grandmother attempted to explain her objection to such a visit, but mother would not listen. Mother later apologized.

Paternal grandmother stated that she did not agree with mother having unmonitored visits with J.F. unless authorized by the juvenile court. Mother played and sang to J.F. during visits, but did not bring him healthy food. Paternal grandmother opined that being a full-time mother entailed more than playing and singing and that mother was not able to be a full-time mother.

The social worker spoke with mother who said that she had learned new anger management skills. Mother denied having any "incidents" with paternal grandmother, the social worker, or the staff at Shields for Families. Mother said that she had stopped using drugs. She claimed that she had always been an "excellent" parent and was getting better.

The Department recommended that the juvenile court deny mother's section 388 petition. Because mother was in the middle stages of her drug treatment program, it appeared that she needed additional support to continue her efforts at lifelong sobriety. Although mother had completed a parenting class, she did not fully understand how her behavior and drug abuse impacted J.F.'s life and wellbeing. She continued to have angry outbursts—having screamed at the social worker and J.F.'s caretaker, despite her claim

10

that she had learned new skills to control her anger. Although mother claimed to have learned how to better parent J.F., she continued to expose herself to high risk situations such as having contact with Eli M. who had abused her, and with her brother who had sexually abused her.

In an August 2013 letter to the Department, Kaufman, mother's therapist at Shields for Families, stated that mother was working on the following treatment plan issues: "1) Continue expression of feelings. 2) Maintain sobriety. 3) Discuss issues where negative choices were made in the past in order to learn to make better choices now and in the future. 4) To learn to view choices, responsibilities and goals as a mature adult." The therapist stated that mother had "clearly made progress in her individual therapy, however, more is needed in order to meet her current treatment plan goals."

At the hearing on mother's section 388 petition, Tapia, mother's substance abuse counselor at Shields for Families, testified that she had worked with mother for 10 months. They met every day. Mother was in the second, and longest, of the three phases of her treatment program. Tapia believed that mother had made significant change—she had made progress in identifying core issues and in identifying triggers. Mother was able to identify and take responsibility for her actions that led to negative consequences.

According to Tapia, Shields for Families "accommodated" children. Mother had progressed to a point that she could have J.F. live with her at the facility. Mother then had roommates, but would be able to have her own apartment on the facility's grounds if J.F. were to come live with her. Once mother graduated from the program, she could remain at Shields for Families for six months to a year. Thereafter, she would be eligible for lifelong support services.

Tapia testified that mother tested clean while in the program. Mother was also working on her relationships and setting healthy boundaries. Mother was very forthcoming and truthful about her relationships. To Tapia's knowledge, mother did not have a relationship with Eli M. Tapia appears to have testified that mother likely would not graduate from the program earlier than June 2014.

11

Tapia recounted a conversation with the social worker in which the social worker spoke of incidents of anger and aggression mother had with others. Tapia told the social worker that she had not witnessed such behavior in mother, but that she had seen mother throw childlike temper tantrums. She explained, however, that the tantrums were not aggressive in tone and mother was very easily "redirected." Mother and Tapia had discussed a recent incident with the social worker. Mother admitted raising her voice because she was frustrated. Mother also told Tapia that she had screamed at the caretaker, explaining that she was upset about a visit.

Mother testified that she was drug free. Mother was able to remain sober by thinking about how much she lost while using drugs. She had a different mindset, did not think as she used to, and did not want to take drugs anymore. Mother admitted that her drug of choice had been marijuana, which she used when she could not sleep or when she thought about her problems. When mother presently had the urge to use marijuana, she distracted herself by singing or cleaning her room.

Mother did not believe that she had a temper. She denied that she yelled at the social worker—she was just trying to get across her point and it seemed as though the social worker was "resistant" to anything she had to say. She also denied yelling at the paternal grandparents—she raised her voice "slightly" to get her point across about a visitation issue.

Mother testified that she was not presently in a relationship. She last had contact with Eli M. three months earlier. Mother did not have transportation to a visit and had asked Eli M. to take her.

Mother said she was ready to be a mom and to have J.F. live with her. She was ready to take care of him—to do such things as getting him ready and taking him to school. Mother visited J.F. once a week for three hours. She rarely spoke with him on the phone.

The juvenile court denied mother's section 388 petition. It ruled that there were changing, but not changed circumstances and the requested orders—custody or further family reunification services with unmonitored visitation—were not in J.F.'s best

12

interest. The juvenile court then terminated mother's and father's parental rights over J.F.

## DISCUSSION

**I.     Mother's Notice of Appeal Was Sufficient**

The Department argues that mother's notice of appeal was insufficient because it referred only to the juvenile court's order terminating mother's parental rights under section 366.26, and did not refer to the juvenile court's order denying her section 388 petition. Mother's notice of appeal was sufficient.

Mother's notice of appeal specifies that mother appealed from the juvenile court's order under section 366.26 terminating her parental rights, entered the same day as the juvenile court's order denying her section 388 petition. We liberally construe mother's notice of appeal to encompass the order denying her section 388 petition, and therefore have jurisdiction to review that order. (*In re Madison W.* (2006) 141 Cal.App.4th 1447, 1450.)

**II.    The Juvenile Court Did Not Abuse Its Discretion in Denying Mother's Section 388 Petition**

Section 388, subdivision (a) permits anyone having an interest in a dependent child to petition the juvenile court for a hearing to change, modify or set aside a previous order on the ground of changed circumstances or new evidence.[3] If the petition shows changed circumstances or new evidence indicating that the proposed modification "may

---

3     Section 388, subdivision (a) provides in pertinent part: "Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . or the child himself or herself . . . through a properly appointed guardian may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court or in which a guardianship was ordered pursuant to Section 360 for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court."

13

be" in the child's best interests, the juvenile court must hold a hearing on the petition within 30 days. (§ 388, subd. (c); Cal. Rules of Court, rule 5.570(e), (f).)

If the juvenile court grants a hearing, "the burden of proof is on the moving party to show by a preponderance of the evidence that there is new evidence or that there are changed circumstances that make a change of placement in the best interests of the child." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) "After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child. [Citation.]" (*Ibid.*) That "presumption obviously applies with even greater strength when the permanent plan is adoption rather than foster care." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 464.) The parents' burden is particularly weighty when the section 388 petition is made "'on the eve of the section 366.26 permanency planning hearing, [when] the children's interest in stability [i]s the court's foremost concern and outweigh[s] any interest in reunification. [Citation.]' [Citation.]" (*In re Angel B., supra,* 97 Cal.App.4th at p. 464; *In re Edward H.* (1996) 43 Cal.App.4th 584, 594.)

We review the juvenile court's denial of a section 388 petition for abuse of discretion—i.e., whether the juvenile court's decision was arbitrary, capricious, or patently absurd. (*In re Stephanie M., supra,* 7 Cal.4th at p. 318.) "'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' [Citations.]" (*Id.* at pp. 318-319.)

A.      *Changed Circumstances*

"A petition which alleges merely *changing* circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point,

does not promote stability for the child or the child's best interests. (*In re Edward H., supra,* 43 Cal.App.4th 584, 594.) "'[C]hildhood does not wait for the parent to become adequate.'" (*In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610 [29 Cal.Rptr.2d 654].)" (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47, italics added.)

Mother contends, based on her performance in the Shields for Families program, that the circumstances that caused the juvenile court to terminate her family reunification services have changed. According to Tapia, mother's substance abuse counselor at Shields for Families, mother had "come a long way" and had made "significant change." Mother had gain insight into her behaviors and had tested clean during the 10 months she was in the program. Tapia also stated, however, that mother was in the middle stage of a one to two year program, mother was still working on her behaviors, and mother could benefit from additional treatment. Tapia also reported that mother sometimes engaged in childlike behavior by throwing temper tantrums, and believed that mother needed "to do some work" and "to identify her triggers" that led to such behavior.

According to Kaufman, mother's therapist at Shields for Families, mother was putting in effort, was much better than before, and was making progress. Kaufman also stated, however, that mother did not have complete knowledge and understanding of domestic violence and its impact on her and J.F.'s lives. Kaufman further stated that while mother "clearly made progress in her individual therapy . . . more is needed in order to meet her current treatment plan goals."

The social worker and paternal grandmother said that mother had screamed at them about visitation issues. Mother denied that she had a temper, and attempted to minimize her conduct, stating that she had only raised her voice to get across her point. According to paternal grandmother, mother continued to have contact with Eli M., who had abused mother. Mother admitted that Eli M. had given her a ride to a visit three months prior to the hearing on mother's section 388 petition.

Mother appears to be doing well in the Shields for Families program. At the time of the hearing on mother's section 388 petition, however, mother was in the middle of that program and her counselor and therapist stated that she needed additional work.

15

Moreover, mother continued to engage in behaviors that led to J.F.'s detention. Thus, while the circumstances that caused the juvenile court to terminate mother's family reunification services may have been changing, the juvenile court did not abuse its discretion in finding that the circumstances had not changed. (*In re Casey D., supra,* 70 Cal.App.4th at p. 47.)

> ### B. Best Interests of J.F.

"It is not enough for a parent to show *just* a genuine change of circumstances under the statute. The parent must show that the undoing of the prior order would be in the best interests of the child." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 529.) "[T]he proper focus [is] on the *child's* interests, not the [parent's]." (*Id.* at p. 534, citing *In re Stephanie M., supra,* 7 Cal.4th at p. 323.)

At the time of the hearing on mother's section 388 petition, J.F. had lived with his paternal grandparents for two years. The paternal grandparents provided J.F. with a safe, nurturing home environment and were attentive to J.F. and to his needs. J.F.'s counselor stated that J.F. generally was a happy toddler who had a strong emotional attachment to paternal grandmother. J.F. sought out paternal grandmother for affection and security and paternal grandmother warmly reciprocated. J.F. developed mentally and physically in the stimulating environment the paternal grandparents provided. Mother, on the other hand, was still working on the issues that led to J.F.'s detention. She was still given to angry outbursts, and she maintained some level of contact with Eli M., one of the men who abused her. According to Kaufman, mother did not have complete knowledge and understanding of domestic violence and its impact on her life and J.F.'s life. Were mother granted custody of J.F., the child would reside in a drug treatment facility for some period of time. Thus, even if mother had shown changed circumstances, the juvenile court did not abuse its discretion in finding that mother failed to show that granting her custody or further family reunification services with unmonitored visitation was in J.F.'s best interests. (*In re Kimberly F., supra,* 56 Cal.App.4th at p. 529.)

16

**DISPOSITION**

The order is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


MOSK, Acting P. J.


We concur:


KRIEGLER, J.


MINK, J.*

---

\* Retired judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17